**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**STATESBORO DIVISION**

CRIDER, INC.,

Plaintiff,

v.                   6:10-cv-39

KEYSTONE FOODS LLC,

Defendant.

## ORDER

### I. INTRODUCTION

Before the Court are Plaintiff Crider, Inc.'s ("Crider") motion for leave to amend its complaint, *see* Doc. 43, Defendant Keystone Foods LLC's ("Keystone") motion for summary judgment, *see* Doc. 44, and Keystone's motion to strike the declaration of Maxwell Harrell, *see* Doc. 63.

### II. FACTS

#### A. Factual History

Crider and Keystone process, freeze, and can poultry and other protein products for industrial, retail, and food services industries. *See* Doc. 1 at 2.

Keystone manufactured fully-cooked chicken products at its plant in Gadsden, Alabama. *See* Doc. 44-4 at 4. Due to concerns about production capacity and quality problems emanating from the plant, Keystone decided to enter into a co-pack arrangement to supply product to its customers while it built a new plant, Steele Station, that would be able to handle Keystone's production needs. *See id.*; Docs. 44-11 at 12-13; 44-6 at 10. Keystone sought out Crider. *See* Doc. 44-11 at 12-13.

Initially, Crider and Keystone entered into a short-term arrangement for use of Crider's smaller cook line ("Line 2"). *See* Doc. 44-30 at 1-16. This signed agreement provided for production of a limited number of pounds rather than for a fixed term. *See id.* at 10.

Crider and Keystone began discussing a more extensive arrangement in late 2008 for use and conversion of Crider's larger production line ("Line 1"). *See* Doc. 44-16 at 3.

Crider sought a long term arrangement while Keystone wanted a one year commitment with an option for a longer agreement. *See* Docs. 47-1 at 2; 55-1 at 7-14. Charles Hill, Keystone's former Vice President of Sales and Marketing, sent Crider an email on December 12, 2008, indicating that Keystone would commit only to a one year commitment of one shift (forty-fifty hours a week) with an option of moving to two shifts. *See* Doc. 47-1 at 2.

By late December 2008, Crider had a list of the equipment it would need to convert Line 1 as well as Keystone's approval to begin the conversion. *See* Doc. 44-6 at 10-11; 44-5 at 9-12.

On January 8, 2009, Tommy Lane ("Lane"), former controller for Keystone's Proteins/Poultry Group, provided Crider's CFO, Maxwell Harrell ("Harrell"), with a document confirming that Keystone desired a commitment of only one year at forty or fifty hours a week. *See* Doc. 44-30 at 29-32. The document further indicated that

Keystone had an option to extend the agreement for another two years or more. *See id.* at 32. Harrell forwarded this document to Billy Crider (Crider's CEO) and Bill Crider (Crider's Vice-President of Sales) on January 8, 2010. *See* Doc. 47-1 at 27-29.

On January 20, 2009, Harrell forwarded a first draft of the Line 1 Co-Pack Agreement to Keystone. *See* Doc. 47-1 at 3-18. The document provided for a one year agreement with an option to extend, at Keystone's pleasure, to a minimum of eighty hours run time over three years. *See id.* at 4.

By March 2009, Crider had completed the modifications to Line 1 and had engaged in full 80-hour-week production despite the lack of a written contract. *See* Doc. 44-6 at 15.

On April 1, 2009, Billy Crider sent an email to Marvin Green, then Vice-President of USA Proteins for Keystone, outlining what the parties had agreed to at that point. *See* Doc. 47-1 at 34-35. The email indicated Crider's understanding that price was the only term upon which the parties had agreed. *See id.* at 35. The agreement explicitly noted "length of the agreement" as an item that needed to be discussed. *See id.*

Lane responded to this email on April 7, 2009, indicating that Keystone had "committed to 80 hours thru February 2010." *See id.* at 37.

Following another meeting in April, Crider and Keystone exchanged another draft dated May 7, 2009. *See* Doc. 44-21 at 3-20. This draft stated that the agreement ended in August 2011. *See id.* at 4.

Keystone proposed minor changes to this draft, which Crider incorporated into a revised draft sent out on June 11, 2009. *See* Docs. 1-2; 44-10 at 13-14. No representative of Keystone ever accepted the June draft, *see* Doc. 55 at 12, but Keystone commented only on minor issues in the draft, *see* Doc. 44-10 at 15.

In mid-2009, Keystone opened Steele Station and saw a large increase in its production capabilities. *See* Doc. 44-15 at 33-34.

In December 2009 or January of 2010, Keystone notified Crider that Keystone was switching all production over to Steele Station and ending its agreement with Crider. *See* Doc. 1 at 6. Crider filed this suit as a result, seeking damages based on breach of contract, promissory estoppel, and unjust enrichment theories. *See* Doc. 1.

**B. Procedural History**

Crider filed its complaint on April 27, 2010. *See* Doc. 1. Keystone filed its answer and counterclaims against Crider on June 21, 2010, *see* Doc. 17, and Crider responded on July 2, 2010, *see* Doc. 20.

The Magistrate Judge entered a Scheduling Order on July 26, 2010, establishing a deadline of August 20, 2010 for amendment of pleadings and a discovery terminus of December 1, 2010. *See* Doc. 23. Upon a joint motion filed by the parties on September 20, 2010, after the deadline for amending pleadings had lapsed, the Court modified the order, extending discovery until February 15, 2011. *See* Doc. 31.

Keystone produced its documents on November 10, 2010. *See* Doc. 47 at 3.

Included in this production were two emails and a draft agreement indicating that Keystone, from late-2008 to early-2009, sought only a one year relationship with Crider. *See* Doc. 47-1 at 1-20.

Keith Lewis, Keystone's former Senior Vice President for Poultry, was deposed on February 10, 2011. *See* Doc. 43-3. He stated that Keystone never intended to enter into a long-term co-packing relationship with Crider. *See id.* at 4.

The parties jointly sought a stay of the case pending mediation, which was ultimately approved twice by the Court: once on March 14, 2011, and again on April 12, 2011. *See* Docs. 39; 41. The deadline for filing civil motions was extended until June 9, 2011. See Doc. 41.

Following discovery and attempts to mediate, Crider filed a motion for leave to amend its complaint on June 8, 2011. *See* Doc. 43. On June 9, 2011, Keystone filed a motion for summary judgment. *See* Docs. 44; 45. In addition, Keystone filed a "Motion . . . to Strike Declaration of Maxwell M. Harrell" on August 2, 2011. *See* Doc. 63.

### III. ANALYSIS

#### A. Motion for Leave to Amend Complaint

In situations such as the present one, Federal Rule of Civil Procedure 15 permits a party to amend its pleadings with "the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). However, the right to amend "is not an automatic right." *Faser v. Sears, Roebuck & Co.*, 674 F.2d 856, 860 (11th Cir. 1982).

In *Foman v. Davis*, the Supreme Court produced the standard for judging motions for leave to amend:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

371 U.S. 178, 182 (1962). Thus, a district court must have a substantial reason to deny leave to amend. *See Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989).

Crider alleges that it did not unduly delay in filing its motion, having requested the amendment "in the most reasonable time possible." *See* Doc 43 at 13. Crider avers

3

that it filed its motion within the deadline for filing civil motions in this case. *See* Doc. 61 at 6.

Crider unduly delayed in asserting its motion to amend. Crider identifies the wrong deadline; the deadline to file a motion to amend was August 20, 2010. *See* Doc. 23. Crider filed its motion on June 8, 2011, ten months after the deadline. *See* Doc. 43. "When a party's motion to amend is filed after the scheduling order's deadline for [motions to join other parties and to amend the pleadings], the party must show good cause for why leave to amend should be granted." *Kendall v. Thaxton Rd. LLC*, 2011 WL 3903400, at *4 (11th Cir. Sept. 7, 2011).

Crider does not identify a good cause for its delay. Crider asserts that newly-discovered facts, testimony from Keystone witnesses indicating that Keystone never intended to commit to a three year relationship with Crider, support the conclusion that granting the motion to amend would be just. *See* Doc. 43 at 2; *see also* Doc. 43-3 at 4 ("The intent wasn't to have a long-term co-pack relationship.").

Crider, however, knew of Keystone's intent before Crider filed its original complaint. Keystone representatives sent at least two emails to Crider indicating that Keystone intended to enter into a one year agreement at most. *See* Doc. 47-1 at 1-2; *id.* at 27-29. The fact that the two parties were at odds over the length of the agreement should have given Crider some indication that Keystone ex ante never intended to enter into a long term arrangement.

Because Crider filed its motion ten months after the deadline and had evidence of Keystone's intent before Crider filed its complaint, the Court finds that a substantial reason exists for denying Crider's motion. *See Kendall*, 2011 WL 3903400, at *5 (affirming district court's denial of motion to amend where party filed motion to amend over two months after deadline and where party knew the facts with which the party wished to amend the complaint). Thus, Crider's "Motion for Leave to Amend Complaint" is ***DENIED***.

### B. Motion for Summary Judgment

1. Motion to Strike Declaration of Maxwell Harrell

Keystone asserts that Harrell's affidavit is a sham and thus should not be considered by the Court in ruling on Keystone's motion for summary judgment. *See* Doc. 63 at 1.

Under the sham affidavit rule, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Akins v. Fulton Cnty., Ga.*, 278 F. App'x. 964, 968 (11th Cir. 2008) (quoting *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984)) (alteration in original). The sham affidavit rule is applied in limited circumstances, and thus, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Id.* (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986); *see also Tippens*, 805 F.2d

4

at 953-54 ("To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness . . . was stating the truth."). "The [C]ourt must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" *Akins*, 278 F. App'x at 968 (quoting *Tippens*, 805 F.2d at 953).

> In his declaration, Harrell states that he:
>
> "was not personally involved in negotiations between Keystone . . . and Crider in late 2008 regarding the agreement . . . . [He] was later informed of the details of the Agreement, including that Keystone had committed to having Crider produce cooked poultry products on Line 1 for 80 hours per week for a minimum of three years."

Doc. 55-4 at 3-4. He contends that he used an unrelated co-pack agreement as a template for the January draft. *See id.* at 3. He also states that he relied on Lane's notes of the agreement and that he was not fully aware of the details of the Agreement, including the fact that the agreement was supposed to continue for three years, at the time he put together the draft. *See id.* Finally, Harrell asserts that Crider and Keystone had already agreed on a three-year Agreement by the time that Billy Crider asked Harrell to begin drafting the agreement. *See id.*

Discrepancies exist between Harrell's declaration, his previous testimony, and the evidence already given in this case. At his deposition, Harrell asserted that he was not involved with the negotiations between Crider and Keystone in late 2008. *See* Doc. 44-10 at 8. He first became involved when he was given the task of coordinating the development of the contract. *See id.* He stated that he would have gotten the parameters of the contract from Bill Crider. *See id.* He indicated that he sent agreement notes, which he thinks he used in constructing the draft, to Billy and Bill Crider to get their input. *See id.* at 9. He does not recall receiving a response. *See id.*

The agreement notes recite that the initial term of the agreement would last for one year and forty hours per week. *See* Doc. 44-19 at 25. Keystone had an option to extend the agreement. *See id.*

In an email sent January 13, 2009, Harrell gave Lane notes Harrell had made in preparation of drafting an agreement. *See* Doc. 47-1 at 31. The email indicates that Harrell had Billy and Bill Crider examine the notes before he sent them to Harrell. *See id.* The notes also reflect that the term of the agreement would be for one year, with Keystone having an option to extend the agreement. *See id.* at 32.

On April 22, 2009, Harrell circulated an agenda for an April meeting that confirmed Keystone's desire for a one-year term. *See* Doc. 44-20 at 25, 27 ("Term was one year at 50 hours with option for 80 . . . .").

5

Thus, the evidence arguably conflicts with Harrell's declaration that he later discovered the agreement was for three years. However, Harrell's answers in his deposition and his assertions in his declaration are not "clear answers" such that they unambiguously conflict with each other. Harrell could have discovered that the agreement was supposed to be for three years instead of one after he circulated the April 22 agenda. Harrell could have relied on an unrelated agreement as a template while incorporating the agreement notes. Although he sent a copy of the notes to Billy and Bill Crider, there is no evidence that the Criders explicitly adopted the one-year term as part of its agreement with Keystone.

Thus, it cannot be said that Harrell's declaration flatly conflicts with the rest of the evidence in this case "in a manner that cannot be explained." See *Akins*, 278 F. App'x at 968. Keystone's Motion to Strike is **DENIED**.

### 2. Summary Judgment Standard

Keystone moves for "partial summary judgment as to Crider's claims for Breach of Contract and Promissory Estoppel to the extent that those claims seek damages for the period beyond February, 2010." *See* Doc. 44-1 at 25.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on summary judgment, the Court views the facts and inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1437 (11th Cir. 1991).

"The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks removed).

The nonmoving party then "may not rest upon the mere allegations or denials of the [nonmoving] party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material only if it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248.

Courts may consider all materials in the record, not just those cited by the parties. FED. R. CIV. P. 56(c)(3).

### 3. Breach of Contract Claim

Keystone contends that Crider's breach of contract claim based on the two-and-a-half year "oral" contract is barred by Georgia's Statute of Frauds. *See* Doc. 44-1 at 17.

Georgia's Statute of Frauds states:

To make the following obligations binding on the promisor, the promise must be in writing and signed by the party to be charged therewith or some person lawfully authorized by him: . . .

(5) Any agreement that is not to be performed within one year from the making thereof . . . .

O.C.G.A. § 13-5-30.

Crider admits that the agreement upon which Crider bases its claim does not satisfy the Statute of Frauds. *See* Doc. 1 at 4 ("While the Co-Pack Agreement was not signed by the parties, all of the terms contained therein were expressly agreed on and the parties continued to perform them after the agreement was finalized."); *id.* at 8 ("Keystone's actions constitute a breach of the Co-Pack Agreement.").

Crider, however, contends that the merchant memorandum exception to the statute of frauds applies to this contract. *See* Doc. 54 at 19. Keystone claims that, while both parties are merchants, this contract is not one for the sale of goods, and thus the merchant exception does not apply. *See* Doc. 62 at 8.

The Statute of Frauds applies to contracts for the sale of goods for the price of $500.00 or more. *See* O.C.G.A. § 11-2-201(1). The Georgia UCC generally applies only to goods. *See* O.C.G.A. § 11-2-102. The Code defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." O.C.G.A. § 11-2-105(1). The Code continues: "Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell." O.C.G.A. § 11-2-105(2).

Crider first contends that the agreement in this case is one for the sale of goods. *See* Doc. 54 at 18. Crider explains that the contract involved Keystone selling raw ingredients and materials to Crider, who would then sell cooked poultry products back to Keystone. *See id.* Finally, Crider argues that the agreement was "[a]t a minimum" a "mixed contract" involving both goods and services. *See id.*

In order to determine whether a mixed sales contract is governed by the UCC, Georgia courts "look to the primary or overall purpose of the transaction." *Crews v. Wahl*, 238 Ga. App. 892, 900 (1999) (internal quotation omitted). When a sale of goods as opposed to services is the primary purpose of the contract, the contract is governed by the UCC. *See Heart of Tex. Dodge, Inc. v. Star Coach, LLC*, 255 Ga. App. 801, 802 (2002).

"[C]ontractual language, the circumstances surrounding the Contract, and the nature of the goods at issue" are all relevant in determining the primary purpose of a transaction. *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1331 (11th Cir. 1998).

7

The Court holds that provision of services was the primary purpose of this agreement; thus the UCC does not apply.

In *Heart of Tex. Dodge*, the Georgia Court of Appeals considered a contract for the modification of an automobile; Heart of Texas Dodge and Star Coach agreed that Star Coach would convert a vehicle into a "custom performance vehicle" and return the vehicle to Heart of Texas Dodge. 255 Ga. App. at 801. The Georgia Court of Appeals determined that "[t]he predominant element of the contract . . . was the furnishing of a service . . . ." *Id.* at 803. The Court looked at the type of business that Star Coach typically engaged in as well as the location of the parts used. *See id.*

In *OMAC, Inc. v. Sw. Machine & Tool Works, Inc.*, the Georgia Court of Appeals considered a contract dealing with the conversion of materials. 189 Ga. App. 42, 42 (1988). OMAC would supply the materials, which Southwestern Machine would then convert into specified parts. *See id.* The court noted that the prices charged by Southwestern Machine were based upon OMAC's supplying the materials. *See id.*

The Court finds this case analogous to *Heart of Tex. Dodge* and *OMAC*. As in those two cases, this agreement involves the modification of separate parts into a final product that is returned to the supplier of the component parts. For this reason, the Court finds this case analogous to the repair and machining contexts.

Furthermore, the draft that Crider bases its breach of contract claim on, the June draft, confirms the conclusion that this agreement was primarily for services. Although Crider purchased the materials from Keystone under the draft, Keystone would reimburse Crider for the materials Crider acquired. *See* Doc. 1-2 at 5. Furthermore, the draft recognized that both parties are in the business of processing, freezing, and canning poultry, not purchasing fully cooked poultry. *See* Doc. 1 at 2. The draft states that the agreement is a "supply, custom processing and contract packing agreement," not a contract for the sale of cooked chicken. *See* Doc. 1-2 at 1. Crider was referred to as a "Processor" as opposed to a seller. *See id.* Keystone was to pay Crider an "operating cost." *See id.* at 5.

Thus, the alleged agreement was primarily purposed towards Crider's provision of a service: cooking the chicken. This agreement was outside of the coverage of Georgia's UCC provisions.

Even if this contract were a contract for the sale of goods, the merchant memorandum exception of the UCC would not apply. The exception provides:

> Between merchants if within a reasonable time a *writing in confirmation* of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [the UCC Statute of Frauds] against such party unless written notice of objection to its contents is given within ten days after it is received.

O.C.G.A. § 11-2-201(2) (emphasis added).

The Co-Pack Agreement is not a "writing in confirmation of the contract."

8

The agreement explicitly states that it is a draft. *See* Doc. 1-2 at 1. Terms are left blank. *See id.* (effective date of the agreement); *id.* at 5 (percentage annual escalation for base rate); *id.* at 12 (termination payment amount and Keystone's address for mandatory notices); *id.* at 14 (signature block). This document confirmed nothing other than the parties' continuing negotiation.

Crider points to the performance of each party until the collapse of their relationship and says that the performance is more indicative of confirmation than other documents, such as invoices, that have been accepted by Georgia courts. *See* Doc. 54 at 21. This assertion ignores the Georgia Code section, which calls not for performance, but for a "writing in confirmation."

Accordingly, even assuming arguendo that it falls within Georgia's UCC provisions, the Co-Pack agreement does not fall under the merchant memorandum exception to the Statute of Frauds.

Crider next contends that the conduct of the parties falls within the part performance exception to the statute of frauds. *See* Doc. 54 at 22.

The Georgia Statute of Frauds does not apply "[w]here there has been such part performance of the contract as would render it a fraud of the party refusing to comply if the court did not compel a performance." O.C.G.A. § 13-15-31.

The part performance creating an exception to the Statute of Frauds "must be consistent with the presence of a contract and inconsistent with the lack of a contract." *R.T. Patterson Funeral Home, Inc. v. Head*, 215 Ga. App. 578, 583 (1994) (quoting *Hudson v. Venture Indus.*, 243 Ga. 116, 118 (1979)).

Crider identifies no performance rendered by either party that is inconsistent with the lack of the contract that Crider claims existed; all "performance" identified by Crider is just as indicative of a contract with a one-year term. *See* Doc. 54 at 21 (discussing Crider's investment in retooling Line 1, Keystone's payment for the equipment, Crider's production of cooked poultry, and Crider's imposition of idling fees). While Crider's modification of line one might offer some evidence of a long-term agreement, Keystone had agreed to reimburse Crider for the equipment even under the alleged one-year agreement. *See* Docs. 44-12 at 3-4; 44-20 at 23. Because Crider can point to no part performance that is singularly indicative of a contract with a two-and-a-half year term, the Court finds that the agreement does not meet the part performance exception to the statute of frauds.

Therefore, the Court finds that Crider's breach of contract claim, insofar as it alleges breach of a contract with a two-and-a-half year term, violates the statute of frauds. Crider's claim for breach of a contract in excess of one year is ***DISMISSED***.

### 4. Promissory Estoppel

Keystone has also moved for summary judgment on Crider's estoppel claim for damages beyond February 2010. Keystone avers that there are no statements in the

9

record on which Crider could reasonably rely in preparing for a three year oral agreement. *See* Doc. 62 at 23-24.

Even though a promise might be unenforceable through the statute of frauds, a promisee may still bring a promissory estoppel claim when:

> (1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiffs to rely on such promise; (3) the plaintiffs relied on such promise to their detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment by surrendering, forgoing, or rendering a valuable right.

*Brown v. Rader*, 299 Ga. App. 606, 611 (2009); *see also Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1340 (11th Cir. 1998) ("It would . . . defeat the purpose of promissory estoppel to confine it to promises that conform to the statute of frauds.").

The Eleventh Circuit reasoned that "[i]t is usually unreasonable to rely on a substantial promise that has not been reduced to writing." *Id.*; *see also R.T. Patterson Funeral Home*, 215 at 584 (noting "general rule that there is no justifiable reliance upon future promises which must be in writing to be enforceable").

In Georgia, "[p]romissory estoppel does not . . . apply to vague or indefinite promises, or promises of uncertain duration." *Ga. Investments Int'l, Inc. v. Branch Banking & Trust Co.*, 305 Ga. App. 673, 675 (2010).

Crider offers little evidence in support of its claim of a promise of a three year agreement. *See, e.g.,* Doc. 44-5 at 11 (Bill Crider Depo.) (stating that Crider purchased no equipment until Keystone "said move forward on our three-year deal"); 55-4 at 3 (Harrell Depo.) (stating that Harrell became involved "[a]fter Crider and Keystone had agreed on their three-year Agreement"). However, the Court must view facts and inferences in the light most favorable to Crider, and thus the Court assumes that Keystone agreed to a three-year term in December 2009, although Keystone quickly backed away from that term.

The Court, however, finds that Crider's reliance was unreasonable. Although the Court must view the facts in the light most favorable to Crider, Crider's evidence shows that the parties had failed to come to a complete agreement by the time Crider began modifying Line 1. Keystone and Crider continued to debate and negotiate terms in mid-December 2008 and beyond. *See* Doc. 55-1 at 7-18. The parties never developed a document that both incorporated Crider's three-year term and satisfied the statute of frauds. Because of the vagueness and indefiniteness of the promise, and because the promise violated the statute of frauds, the Court holds as a matter of law that Crider's reliance was unreasonable.

### IV. CONCLUSION

Crider's "Motion for Leave to Amend Complaint," *see* Doc. 43, is ***DENIED***.

10

Keystone's "Motion . . . to Strike Declaration of Maxwell M. Harrell," *see* Doc. 63, is **DENIED**.

Keystone's "Motion for Summary Judgment," *see* Doc. 44-1, is **GRANTED** with respect "to Crider's claims for Breach of Contract and Promissory Estoppel to the extent those claims seek damages for the period beyond February, 2010." Crider's claims for breach of the contract with the one year term and promissory estoppel with regards to the same remain, as do Crider's claims for unjust enrichment, and attorney's fees and expenses.

This 17th day of October 2011.

*/s/ B. Avant Edenfield*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA